UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NANDIVA ALEXIS,<br>Plaintiff,<br>v.<br>YALE NEW HAVEN HEALTH SERVICES CORPORATION,<br>Defendant. | 3:25-CV-01737 (SFR) |

**MEMORANDUM & ORDER**

Plaintiff Nandiva Alexis, proceeding *pro se*, brings this action against Defendant Yale New Haven Health Services Corporation ("YNHH") in relation to her employment from 2022-2023 as a Patient Care Technician/Patient Care Associate at YNHH's Yale New Haven Children's Hospital. The Amended Complaint asserts that YNHH violated Alexis's rights under Title VII of the Civil Rights Act of 1964, the Connecticut Fair Employment Practices Act, and 42 U.S.C. § 1981 by subjecting her to discrimination on the basis of race. For the reasons stated below, YNHH's Motion to Dismiss is granted with respect to Counts One and Two and granted in part and denied in part with respect to Count Three, although Alexis is afforded leave to file a Second Amended Complaint with respect to her dismissed claims in Count Three.

## I. BACKGROUND

### A. Factual Background

The following allegations from the Amended Complaint are taken as true for the purposes of this Opinion. *See* Am. Compl., ECF No. 22.

Nandiva Alexis, a Black woman of Haitian heritage, began employment at YNHH's Yale New Haven Children's Hospital in 2022 as a Patient Care Technician/Patient Care Associate. Am. Compl. ¶¶ 1, 2, 5. Alexis was assigned to the Pediatric Hematology Oncology Unit located on the seventh floor and worked the night shift. *Id.* ¶¶ 6-7. Alexis was the only Black employee on the night shift. *Id.* ¶ 8. YNHH did not regularly assign a managerial supervisor to the night shift, although Assistant Manager Jaimee Marcus occasionally worked the night shift in her managerial capacity. *Id.* ¶¶ 15, 17. When Marcus did not work the night shift, the end of Alexis's night-shift schedule and the beginning of Marcus's schedule would overlap by about 30 minutes. *Id.* ¶ 16.

Alexis's co-workers Anisha Dinsmore and April Blango often did not provide Alexis with a verbalization of the shift report, which Blango did for two of Alexis's white, similarly-situated coworkers, making Alexis's job more difficult. *Id.* ¶¶ 9, 12, 13. Alexis did receive the shift report at least once from Dinsmore after another nurse standing nearby "intervened and stated, 'I think she's just asking in case there's anything extra.'" *Id.* ¶ 20.

Near the end of her shift on February 21, 2023, Alexis made a complaint about workplace conduct to Marcus. *Id.* ¶ 28. Specifically, Alexis informed Marcus that an unnamed nurse (Dinsmore) refused to provide Alexis with the shift report, though Alexis did receive the shift report after another nurse's intervention. *Id.* ¶ 20. Alexis also related to Marcus that she was told by Blango that Blango would no longer provide her with shift reports because she did not greet Blango appropriately. *Id.* ¶ 21. Marcus emailed Alexis on February 24, 2023, stating that Blango would wait for Alexis's arrival to provide Alexis with the shift report, and that the situation would be revisited at a later date. *Id.* ¶ 26.

Alexis alleges that Dinsmore participated in "retaliatory conduct" after the February meeting, evidenced by the fact that said conduct started only after the February meeting. *Id.* ¶ 31. Such conduct included "persistently asking whether I needed a shift report in an antagonizing manner intended to annoy and provoke me during each shift." *Id.*

Alexis sent an email to Marcus on March 1, 2023, explaining that the work environment contributed to significant mental anguish which led to Alexis's frequently taking time off work. *Id.* ¶ 51.

On March 3, 2023, Alexis received an email from Marcus stating that Marcus and Hiring Manager Denise Carr wished to schedule a Zoom meeting with Alexis within the following week, though the meeting did not end up taking place until April 27, 2023. *Id.* ¶ 34. During the meeting, Marcus and Carr raised patients' families' concerns that Alexis was new to the field. *Id.* The conversation then shifted to focusing on Alexis's interactions with her co-workers. *Id.* ¶ 35. Alexis told Marcus and Carr that she was "often met with ridicule when approaching staff in regards to patient-related matters." *Id.* ¶ 36. Alexis also described an incident from 2022 in which she had to ask a question multiple times before a nurse understood her, with the nurse finally telling her, "I thought you were speaking Chinese." *Id.* Near the end of the meeting, Alexis expressed feeling relief when Marcus was present during the night shift, which made her interactions with the other staff more pleasant. *Id.* ¶ 38. Carr concluded by suggesting that she would send an email to the staff in response to Alexis's concerns of unfair treatment. *Id.* ¶ 39.

On July 17, 2023, Alexis again emailed Carr regarding the workplace environment, suggesting an "intervention." *Id.* ¶¶ 44-45. Alexis, Marcus, and Carr participated in another Zoom meeting on July 20, 2023, during which Alexis told Marcus and Carr that she "felt

targeted by members of the unit and placed particular emphasis on Anisha Dinsmore's conduct towards" her. *Id.* ¶ 45. Alexis named conduct including "glaring at me with disgust upon my arrival for each shift, yelling loudly in the presence of others to demand supplies in a manner intended to humiliate and dehumanize me, and abusing her scheduling authority by assigning April Blango to all available open shifts, thereby limiting my earning potential." *Id.* Alexis further identified another white nurse as an "active participant in workplace bullying and harassment," including telling other nurses that Alexis's help was needed and making sarcastic remarks when Alexis received help. *Id.* ¶ 46.

At some point during or after the meeting, Marcus criticized Alexis for "sleeping in the Khols room" on her break. *Id.* ¶ 48.

The Amended Complaint also alleges that Alexis was treated differently than her co-workers on the basis of race throughout her employment in other ways. She provides the following examples:

- Once, when Alexis and Blango were alone in the staff break room, Blango, a mixed-race woman with a lighter complexion, told someone on the phone, "You know I discriminate. I don't like anything dark other than my coffee or my husband." *Id.* ¶¶ 22, 24.

- Dinsmore "refused to assign" Alexis to overtime shifts, instead assigning open overtime slots to Blango. *Id.* ¶ 28. Once, when Alexis volunteered for overtime, Katherine Winkle advised Alexis that she should report to work, but then called back after fifteen minutes and said that she was no longer needed. *Id.* ¶ 29. Alexis believes this is because Dinsmore refused to add Alexis's name to the schedule. *Id.*

- Blango left "supplies unstocked in order to increase my workload, laughing at my presence in front of other staff members." *Id.* ¶ 30.

- Alexis alleges that when she would enter a room, "such as the staff break room, individuals would immediately leave, only to return once I exited." *Id.* ¶ 41. In addition, "Dinsmore would regularly gather other White nurses in the staff break room to laugh at me whenever I asked questions related to patient care or chose to remain quiet as they attempted to provoke an angry response from me." *Id.*

According to Alexis, such behaviors ceased for one or two days following the April 2023 meeting but resumed thereafter. *Id.* ¶ 40.

- Alexis further alleges that when "assistance was provided to other workers who did not identify as Black or as persons of color, they were treated collaboratively as a team. In contrast, I was singled out, labeled as lazy, and subjected to ridicule." *Id.* ¶ 47.

On August 28, 2023, believing that Marcus's criticism about her sleeping at work was made "solely as an act of retaliation" that could eventually result in "possible termination," Alexis submitted her resignation to her hiring manager, reporting that she was feeling "mentally unwell." *Id.* ¶¶ 50-52. Alexis's last day of work was September 11, 2023, on which she sent her hiring manager another email reporting to be "mentally unstable." *Id.* ¶¶ 53-54.

**B. Procedural History**

Alexis first filed this action in Connecticut state court on August 21, 2025, against YNHH as well as individual defendants Taylor Lint, Anisha Dinsmore, April Blango, Jaimee Marcus, Shealyn Rodrigo, Stephanie Nixon, and Katherine Winkle (collectively, "Individual Defendants"). ECF No. 1-1, at 2; *see* ECF No. 1-2, at 2-3; ECF No. 1, at 1-4. Defendants filed a notice of removal to this Court on October 15, 2025. ECF No. 1.

YNHH and the Individual Defendants filed a Motion to Dismiss on November 11, 2025. ECF No. 20. On December 12, 2025, Alexis filed the currently operative Amended Complaint, which named only YNHH as a defendant, dropping the Individual Defendants. ECF No. 22. YNHH filed its Motion to Dismiss the Amended Complaint on January 26, 2026. Def.'s Mem, ECF No. 31-1. On February 17, 2026, Alexis filed her Memorandum in Opposition. Pl.'s Mem., ECF No. 32. YNHH filed a reply on March 3, 2026. Def.'s Reply, ECF No. 33.

## II. LEGAL STANDARD

When considering a motion to dismiss under Rule 12(b)(6), the court must "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (citation modified). However, a complaint may not survive unless it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Kim v. Kimm*, 884 F.3d 98, 103 (2d Cir. 2018); *Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155-56 (D. Conn. 2016). Although this "plausibility" requirement is "not akin to a probability requirement," it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008).

Alexis is proceeding *pro se* in this litigation. "It is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Consistent with this duty, the "submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation modified).

## III. DISCUSSION

Count One of the Amended Complaint alleges race and color discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII"). Am. Compl. ¶ 58. Count Two of the Amended Complaint alleges race and color discrimination in

violation under the Connecticut Fair Employment Practices Act ("CFEPA"). *Id.* Count Three of the FAC alleges race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981"). *Id.* Construing the Amended Complaint liberally, I conclude that each count alleges discrimination on theories of retaliation, a hostile work environment, and constructive discharge.

YNHH contends that Alexis's CFEPA claims are barred for failure to exhaust administrative remedies and her Title VII claims are time-barred. Def.'s Mem 1. In her response, Alexis "acknowledge[s]" that her Title VII and CFEPA claims "may be procedurally barred" without engaging in any further analysis. Pl.'s Mem. 1. I therefore consider Alexis's claims under Title VII and CFEPA abandoned. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) ("[A] court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

**A. Section 1981 Claims**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). By "outlaw[ing] discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment," Section 1981 "provides a cause of action for race-based employment discrimination." *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 70 (2d Cir. 2023) (citation modified).[1]

---

[1] The Amended Complaint makes references to discrimination and bias on the basis of national origin. Am. Compl. ¶¶ 9, 37. However, Section 1981 provides a cause of action for discrimination on the basis of race, including "ancestry or ethnic characteristics," but not national origin. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see Vill. of Freeport v. Barrella*, 814 F.3d

Each of retaliation, hostile work environment, and constructive discharge claims can be made under Section 1981. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720-25 (2d Cir. 2010).

**1. Retaliation**

Retaliation claims made under Section 1981 are evaluated under a three-step burden shifting analysis, in which the plaintiff must first establish a *prima facie* case of retaliation. *Id.* at 720. In order to establish a *prima facie* case of retaliation, a plaintiff must demonstrate that "(1) she engaged in protected activity, (2) the defendant was aware of that activity, (3) she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse, and (4) there was a causal connection between the protected activity and the materially adverse action or actions." *Carr v. New York City Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023). I conclude that Alexis has failed to make out a *prima facie* case of retaliation because she does not allege that she engaged in conduct that constitutes a protected activity.

Alexis argues that her reports to Marcus and Carr about the workplace environment constitute protected activity. Complaining to a supervisor about unlawful discrimination, such as discrimination on the basis of race, is a protected activity. *See Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015) ("Retaliation occurs when an employer takes action against an employee . . . because he engaged in protected activity—complaining about or otherwise opposing discrimination."). However, "complaints about conduct other than unlawful discrimination do not constitute protected activities subject to a retaliation claim."

---

594, 604-05 (2d Cir. 2016); *Walker v. Accenture PLC*, 511 F. Supp. 3d 169, 199 (D. Conn. 2020). I therefore analyze only whether the Amended Complaint states a plausible claim of race discrimination.

*Moore v. Hadestown Broadway Ltd. Liab. Co.*, 722 F. Supp. 3d 229, 254 (S.D.N.Y. 2024) (citation modified). A complaint to a supervisor qualifies as a protected activity only so long as a plaintiff "articulate[s] the substance of her complaint in such a way that her employer would reasonably understand that it was about unlawful discrimination against her." *Id.* at 255 (citation modified).

In the February 2023 meeting, Alexis explained to Marcus that she was not receiving shift reports. Am. Compl. ¶¶ 20-21. However, Alexis did not tell Marcus that she thought she was being subjected to unlawful discrimination or provide any details from which such an inference could have been drawn. The specific complaint Alexis did make to Marcus was that Blango would not provide her with shift reports because Blango felt that Alexis did not "greet her appropriately." *Id.* ¶ 21. This comment, on its face, suggests nothing more than ordinary interpersonal workplace conflict.

In the April 2023 meeting, Alexis described to Marcus and Carr that she was "often met with ridicule when approaching" her co-workers and related an incident where a nurse said to her, "I thought you were speaking Chinese." *Id.* ¶ 36. However, Alexis did not express concern that these were instances of racial discrimination. Without explicit reference to race by Alexis, a reasonable observer would not have understood that Alexis, a Black woman, was raising these incidents to complain about discrimination she faced on the basis of race. Indeed, Alexis made no reference in the meeting to Blango's alleged statement, "You know I discriminate. I don't like anything dark other than my coffee or my husband." *Id.* ¶ 38.

So too with the July 2023 meeting, in which Alexis complained to Marcus and Carr about unprofessional behavior by Dinsmore and Lint, including "glaring," "yelling," and "sarcastic remarks." *Id.* ¶¶ 45-46. The mere description of these actions would be insufficient

to put a reasonable party on notice of racial discrimination, and Alexis made no allegations to her supervisors that these actions constituted unlawful discrimination.

Because the Amended Complaint fails to allege that Alexis complained to Marcus or Carr about unlawful discrimination or engaged in any other protected activity, the retaliation claim fails.

**2. Hostile Work Environment**

Alexis argues that various acts by her co-workers created a hostile work environment. Alexis alleges that (1) Dinsmore often did not provide a verbal shift report, asked her questions in antagonizing manner (which Dinsmore did not do to two white co-workers and one biracial co-worker), glared at her, yelled at her, laughed at her, refused to schedule her for overtime shifts, and gathered other co-workers to laugh at her; (2) Lint gathered nurses to inform her that her help was needed, and offered sarcastic remarks when she received help from colleagues; (3) an unnamed nurse did not understand a question she asked until she repeated it multiple times, with the nurse finally telling her, "I thought you were speaking Chinese"; (4) Blango initially refused to provide her with verbal shift reports (which Blango did provide to two white co-workers), left supplies unstocked, laughed at her, and said while they were both in the break room, "You know I discriminate. I don't like anything dark other than my coffee or my husband"; and (5) she was "singled out, labeled as lazy, and subjected to ridicule" when receiving help while her white co-workers were not. Am. Compl. ¶¶ 9, 13, 22, 28, 30, 32, 37, 41, 45, 46, 47.

YNHH argues that Alexis's hostile work environment claim fails because the work environment was not hostile because of race; because the alleged incidents were not severe or

pervasive enough to create a hostile work environment; and because the alleged conduct should not be imputed to YNHH. Def.'s Mem. 14-18, 18 n.4. I address each argument in turn.

**a. Minimal Inference of Discrimination**

A hostile work environment claim is only actionable under Section 1981 "when it occurs *because* of an employee's protected characteristic." *Cadet v. All. Nursing Staffing of New York, Inc.*, 632 F. Supp. 3d 202, 228 (S.D.N.Y. 2022) (emphasis added) (citation modified); *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020) ("[A] plaintiff must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right."). No matter how objectionable, "[w]ork environments that are hostile for non-discriminatory reasons do not fall within the ambit" of anti-discrimination laws. *DeLaurencio v. Brooklyn Children's Ctr., Superintendent*, 111 F. Supp. 3d 239, 248-49 (E.D.N.Y. 2015) (citation modified).

At the motion to dismiss stage, "the question is not whether a plaintiff is *likely* to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.,* whether plaintiffs allege enough to nudge their claims across the line from conceivable to plausible." *Vega*, 801 F.3d at 87 (citation modified). That is, "a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." *Id.* at 84 (citation modified). As the Second Circuit has explained, such "[a]n inference of discrimination can arise from circumstances including . . . the more favorable treatment of employees not in the protected group." *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015).

The Amended Complaint alleges that Alexis was the only Black employee on the night shift; that she alone faced yelling, ridicule, mockery, and laughter; supplies were left

unstocked, increasing only her workload; and that, according to her, this differential treatment from the other, non-Black employees was because of her race. Alexis has identified specific individuals responsible for these actions and has alleged that YNHH's non-Black employees were treated differently. "These allegations are sufficient to give Defendant notice of Plaintiff's claims under Rule 8(a), and satisfy this *pro se* plaintiff's burden to plead a minimal plausible inference of discriminatory intent." *Shouq v. Norbert E. Mitchell Co.*, No. 3:18-cv-00293 (CSH), 2018 WL 4158382, at *10 (D. Conn. Aug. 30, 2018); *Berroa v. Dep't of Developmental Servs.*, No. 3:19-cv-00867 (JCH), 2020 WL 12863317, at *9 (D. Conn. Sept. 17, 2020) (concluding that the plaintiff's allegations that she was scrutinized in a way non-Hispanic employees were not gave rise to a minimal inference of discrimination); *see Johnson v. Connecticut Dep't of Admin. Servs. Bureau of Enter. Sys. & Tech.*, No. 3:17-cv-00901 (JAM), 2018 WL 306697, at *8 (D. Conn. Jan. 5, 2018) (concluding that the plaintiff raised a minimal inference of discrimination where he relied "exclusively on the fact that he was treated differently from other employees in his work center"). I therefore conclude that Alexis has sufficiently alleged facts giving rise to a minimal inference of discrimination, satisfying all that is required of her at this stage of litigation.

**b. Altered Conditions of Employment**

"To establish a hostile work environment claim under Section[] 1981 . . . a plaintiff must first produce evidence that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Williams*, 61 F.4th at 68 (citation modified). Nonetheless, as the Second Circuit has observed, "[t]he fact that the law requires harassment to be severe or pervasive before it

can be actionable does not mean that employers are free from liability in all but the most egregious of cases." *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997).

"To survive a motion to dismiss, a plaintiff need only plead facts sufficient to support the conclusion that she was faced with harassment of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Anderson v. City of New York*, 712 F. Supp. 3d 412, 429 (S.D.N.Y. 2024) (citation modified). In evaluating whether Alexis has alleged that the work environment was hostile, I "consider the totality of the circumstances, . . . evaluate the quantity, frequency, and severity of the incidents, and [] consider those factors cumulatively, so that [I] may obtain a realistic view of the work environment." *Williams*, 61 F.4th at 74 (citation modified).

According to the Amended Complaint, Dinsmore and Blango belittled and demeaned Alexis on a regular basis, including in front of other co-workers, often inviting them to join in. Moreover, their conduct regarding the shift reports and supplies interfered with Alexis's job duties, causing her difficulty and delay. And as the Amended Complaint alleges, Alexis's mental health suffered to the point where she took time off work, informing YNHH of why she was doing so. I conclude that Alexis has plausibly alleged repeated and pervasive conduct that altered the conditions of her employment, as courts in this District have held with respect to similar allegations. *See Laghari v. Dep't of Correction*, No. 3:25-cv-01373 (VAB), 2026 WL 1622989, at *7 (D. Conn. June 5, 2026) ("When viewed together, [the plaintiff]'s allegations plausibly suggest that the alleged conduct was not merely episodic workplace friction, but part of a broader pattern of discriminatory hostility."); *Malkani v. Gartner, Inc.*, No. 24-cv-01009 (SFR), 2026 WL 893217, at *7 (D. Conn. Mar. 31, 2026) (collecting cases); *Johnson*, 2018 WL 306697, at *8 (concluding that the plaintiff's "detailed allegations about

how Wells froze out and marginalized plaintiff are sufficient at this initial pleading stage to allege a plausible claim for hostile work environment" where complaint alleged that "Wells marginalized plaintiff, refused to communicate critical information to him, and relied instead on plaintiff's subordinate—all severely compromising plaintiff's status and ability to do his job"); *see also Williams*, 61 F.4th at 76 (explaining that "all a plaintiff must show is that the harassment altered working conditions as to make it more difficult to do the job") (citation modified).

These allegations may not, in the end, amount to the severity and pervasiveness necessary to find a hostile work environment. But "whether the adverse acts were sufficiently pervasive and prejudicial . . . cannot be considered by me at this initial pleading stage." *Johnson*, 2018 WL 306697, at *8; *Laghari*, 2026 WL 1622989, at *7 (D. Conn. June 5, 2026) ("At this stage, [the plaintiff] need not prove that the alleged conduct actually altered the conditions of his employment, he must allege facts making that inference plausible.").

**c. Imputing Co-Workers' Conduct to YNHH**

When a plaintiff relies on the conduct of her non-supervisory co-workers to make out a hostile work environment claim, the plaintiff must "establish that the discriminatory conduct may be imputed to the employer." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014). Here, Alexis must plausibly allege that YNHH either "failed to provide a reasonable avenue for complaint or that it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019) (citation modified).

"To show that [a defendant] failed to take appropriate remedial action, a plaintiff must show that (1) *someone* had actual or constructive knowledge of the harassment, (2) the

knowledge of this individual can be imputed to the employer, and (3) the employer's response, in light of that knowledge, was unreasonable." *Olaya v. Beacon Communities Corp.*, No. 3:22-cv-00882 (VDO), 2024 WL 550738, at *8 (D. Conn. Feb. 12, 2024). Alexis has alleged that she informed Marcus and Carr, both of whom exercised a managerial role for YNHH, that she faced ridicule, bullying, harassment, and dehumanization. The only response from YNHH, per the Amended Complaint, was Carr's suggestion of an email to the staff. Whether this was a reasonable response from YNHH—as compared with, say, more regularly assigning a manager to the night shift—is a question requiring further factual development and inappropriate to resolve on a motion to dismiss.

I therefore conclude that Alexis has pleaded that she was subjected by YNHH to a hostile work environment because of her race, and deny the motion to dismiss Alexis's Section 1981 claim alleging a hostile work environment.

**3. Constructive Discharge**

The Amended Complaint does not raise constructive discharge as a separate allegation. In light of Alexis's *pro se* status, I read the Amended Complaint as offering two distinct theories of constructive discharge. Neither theory, however, states a plausible constructive discharge claim that entitles Alexis to relief.

First, Alexis seems to allege that Marcus's alleged retaliation against her for reporting her workplace concerns, including Marcus's criticism of her for sleeping in the Khols room, amounts to constructive discharge. Am. Compl. ¶ 50. However, because I dismissed Alexis's claim of retaliation, I must also dismiss any claim of constructive discharge resulting from retaliation. *See Rebele v. Potter*, 818 F. Supp. 2d 534, 539 (E.D.N.Y. 2011) ("When dealing

with a claim for constructive discharge resulting from retaliation, actual retaliation is a necessary predicate.") (citation modified).

Second, the Amended Complaint can be read to imply that the acts that Alexis alleges gave rise to a hostile work environment are the same acts upon which I should find constructive discharge. Am. Compl. ¶¶ 51-53. The standard for establishing a constructive discharge, however, is "higher than the standard for establishing a hostile work environment." *Fincher*, 604 F.3d at 725. "Where an alleged constructive discharge stems from an alleged hostile work environment, a plaintiff must show working conditions so intolerable that a reasonable person would have felt compelled to resign." *Id.* (citation modified). Moreover, while "a hostile work environment claim based on co-worker's actions can be established merely by showing that the employer knew of the harassment but did nothing about it, a claim for constructive discharge requires a showing, at a minimum, that the employer deliberately created intolerable working conditions." *Belfiglio-Martley v. Waterford Country Sch., Inc.*, No. 3:11-cv-00125 (MRK), 2012 WL 1597004, at *7 (D. Conn. May 7, 2012) (citation modified).

I conclude that Alexis's factual allegations do not rise to the level necessary to support a claim for constructive discharge. Alexis alleges that the constructive discharge was the result of a year of being subjected to the hostile work environment. Am. Compl. ¶ 51. Rather than showing why a reasonable person would have felt compelled to resign under the circumstances, Alexis's allegation undercuts the necessary proposition that the working conditions were intolerable enough to warrant such a reaction. Nor can I infer from any of Alexis's allegations, according to which her co-workers were responsible for creating the hostile work environment, that there was intent on the behalf of YNHH or any managerial employees to create the hostile work environment.

I therefore find that Alexis has failed to plead adequate facts upon which to state a claim of race-based discrimination through constructive discharge.

### B. Leave to Amend

A court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *Chipkin v. Better Packages, Inc.*, No. 3:24-cv-01435 (SVN), 2025 WL 2319994, at *6 (D. Conn. Aug. 12, 2025) (stating that "because it is possible that Plaintiff could replead his [claims] with further details . . . the Court will permit Plaintiff leave to file an amended complaint"). Accordingly, Alexis is granted leave to file a Second Amended Complaint to remedy the deficiencies identified in this Opinion with respect to her Section 1981 retaliation and constructive discharge claims.

## IV. CONCLUSION

For the reasons stated above, YNHH's Motion to Dismiss is GRANTED in part and DENIED in part. Alexis may file a Second Amended Complaint on or before October 25, 2026, to remedy the deficiencies identified in this Opinion with respect to her Section 1981 retaliation and constructive discharge claims. If Alexis does not file a Second Amended Complaint by that date, the case will proceed solely on the Section 1981 hostile work environment claim.

**SO ORDERED.**

New Haven, Connecticut
September 25, 2026

/s/ *Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge